

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AL:MKP
F. #2017R00050

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 15, 2017

By Hand and ECF

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 15 2017 ★
BROOKLYN OFFICE

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    United States v. Richard Luthmann, et al.
             Criminal Docket No. 17-664 (JBW)

Dear Judge Levy:

    The defendants Richard Luthmann, George Padula III and Michael Beck are scheduled to appear before the Court at 2:00 p.m. today for arraignment. This letter is respectfully submitted in support of the government's request for a permanent order of detention as to all three defendants in this case. Because the defendants are all charged with brandishing a firearm in furtherance of a crime of violence, there is a presumption in favor of detention. The defendants cannot overcome this presumption because there is no set of conditions that can reasonably assure the safety of the community, the integrity of the judicial process, or the defendants' appearance in court.

I.    Background

    On November 30, 2017, the grand jury returned an eleven-count indictment charging the defendants Richard Luthmann, George Padula III and Michael Beck with kidnaping, in violation of 18 U.S.C. § 1201(a)(1), kidnaping conspiracy in violation of 18 U.S.C. § 1201(a), extortionate collection of credit, in violation of 18 U.S.C. § 894(a), extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a), and brandishing a firearm during and in relation to those crimes of violence, in violation of 18 U.S.C. § 924(c). The defendants Luthmann and Padula were also charged with wire fraud conspiracy, in violation of 18 U.S.C. § 894(a), money laundering, in violation of 18 U.S.C. § 1957, money laundering conspiracy, in violation of 18 U.S.C. § 1957, and aggravated

identity theft, in violation of 18 U.S.C. § 1028A. The defendant Luthmann was also charged with access device fraud, in violation of 18 U.S.C. § 1029, and an additional count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

As alleged in the indictment, which is incorporated herein by reference, between August 2015 and February 2016, Luthmann, who is a practicing lawyer on Staten Island along with Padula and others, including a cooperating witness (the "CW"), participated in a scheme to defraud scrap metal companies by contracting to send them shipping containers filled with valuable scrap metal, but in fact sending them shipping containers filled primarily with cheap filler material. The fraud involved putting only enough valuable scrap metal at the top of the container or immediately behind predrilled holes in the container to make it appear as if the container was filled entirely with valuable scrap metal.

Luthmann and Padula both claimed that Padula had organized crime connections, including that his father was a member of a New York-based organized crime family and that Padula's uncle was a high-ranking member of that crime family. The co-conspirators agreed that if there were ever issues with disgruntled fraud victims or if other members of organized crime learned about the fraud and wanted a share of the proceeds, Padula's organized crime connections could be used to resolve those conflicts. Indeed, in August 2016, after the fraud was over, Luthmann told the CW that "Chinese men" had shown up at his office, one with a gun, that he had a private investigator research them and that they were members of Chinese organized crime. At Padula's and Luthmann's direction, the CW provided $23,000 to Padula, which Padula and Luthmann said would be provided to Padula's organized crime connections in order to have them, including defendant Michael Beck, conduct a "sit down" to resolve the conflict. Padula and Luthmann said that Beck was an enforcer for the organized crime family to which Padula's family members belong and was "muscle" for Padula. Padula and Luthmann said they were each paying for the "sit down" as well, and shortly thereafter Padula told Luthmann and the CW that the "sit down" had been successful.

Luthmann's law practice was integral to the fraud. He filed incorporation papers with New York State for fraudulent companies that he and his co-conspirators used to facilitate the fraud, and he used his law office as the address for the fraudulent companies. Moreover, he recruited a blind client, who was on public assistance, to be the nominal president of one of the fraudulent companies by promising to handle a case for him and offering to pay him. Luthmann also helped set up bank accounts to receive victims' money

and he used his IOLA account and his firm credit card account to launder money. He also transferred money from his domestic accounts to offshore accounts.[1]

On December 5, 2016, Luthmann asked the CW to meet him at his law office to sign some paperwork and said that they would then go out together for the evening. When the CW arrived at the office, Luthmann was not there. The CW contacted Luthmann, who told him to wait inside a conference room in the office. While the CW was waiting, Padula and Beck entered the room and blocked him from exiting. Beck pulled out a gun, aimed it at the CW's head and knee and said he was owed $10,000. Beck explained that he had purchased a $7,000 debt that the CW owed Padula for legal fees that the CW had owed Luthmann, which Padula had paid, and had added a $3,000 "vig," or interest payment. Beck also stated that he had conducted the "sit down" for the CW and received nothing in return. Beck left the room, handed the gun to Padula, and told Padula to "blow out" the CW's knee. When Beck left, Padula removed the bullets from the gun, but told the CW that Beck was "serious." Padula walked out with the CW, and Padula told him not to contact the police. The CW tried repeatedly to reach Luthmann after the incident but Luthmann would not answer his calls.

On or about December 28, 2016 and December 29, 2016, the CW and his son received text messages from a phone number they were unfamiliar with. The messages to the CW included the following: (1) "How far would you like this to go? I guess you think you're going to ignore this. No problem. Remember you're taking this to a new level."; (2) "I promise I will see both your sons this week. You must think I'm nothing. You're going to find out real soon how serious I am. I'll give you 10 minutes to get back to me or I'm speaking with your sons this week."; (3) "Ok, all done. You can't steal from me like you steal from all those Chinese people."; and (4) "I'm in red bank you can meet me here or I'll come to your house. Please don't make me come to your house." Red Bank is a town in New Jersey where, according to the CW, he would occasionally meet Padula to provide Padula with cash.

Also relevant, throughout the fraud and until at least late December 2016, there was a box (the "Box") kept at Luthmann's office that contained records related to the

---

[1] Throughout the fraud Luthmann referred to himself as "Saul" to his co-conspirators, a reference to the character Saul Goodman on the television show <u>Breaking Bad</u>, who is a corrupt lawyer for a methamphetamine cooking and distribution ring. Among other things, Saul Goodman helped his clients launder money and hired an impersonator to go to jail in the stead of another character who had been arrested.

fraud. The Box contained items such as invoices, photographs and a notebook containing the the CW's handwritten notes. The CW would periodically review items in the Box up until December 2016. Luthmann told the CW that it was better to keep documents related to the Omni fraud at the law office because it is more difficult to get a search warrant to search an attorney's office and because the documents could be protected under the guise of the attorney-client privilege. On another consensual recording of Luthmann, Luthmann stated, in some and substance, that the paperwork related to the fraud was "gone."

Notably, at the time Luthmann said the paperwork was "gone," he already knew there was an investigation into the fraud, because he had received an administrative subpoena from the United States Commerce Department in or around February 2017. He responded to that subpoena by providing only 23 pages of redacted documents (far fewer than the CW says existed) and asserted "attorney-client privilege as to any additional disclosure" in his cover letter.[2]

II.  Legal Standards

   A.  Overview

Under the Bail Reform Act, Title 18, United States Code, Sections 3141, et seq. (the "Act"), federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Significantly, there is a presumption in favor of detention where, as here, the defendants are charged with violations of Section 924(c). 18 U.S.C. § 3142(f)(1)(A).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

---

[2] On their face, the redactions are clearly not valid assertions of attorney-client privilege, even if such a privilege existed, which it does not under the crime fraud exception. For example, redactions included the names of the purchasers on invoices the co-conspirators sent to victims. Such information is not protected by the attorney-client privilege, and these redactions seem designed to make it more difficult for the government to identify victims who had evidence against the co-conspirators.

> (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";
>
> (2) "the weight of the evidence against the person";
>
> (3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and
>
> (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

### B. Dangerousness and Risk of Obstruction or Witness Tampering

The concept of "dangerousness" encompasses the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, as well as more generally "the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). In addition, when a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence. United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985). "Dangerousness" is not limited to violent conduct and can include risk of economic harm. See United States v. Madoff, 316 Fed. App'x 58, 59-60 (2d Cir. 2009).

"Dangerousness" also includes the risk of witness tampering or obstruction of justice. United States v. LaFontaine, 210 F.3d 125, 133-34 (2d Cir. 2000). The risk of tampering or obstruction warranting detention need not include actual violence or threats of violence. See id. at 134 ("Although witness tampering that is accomplished by means of violence may seem more egregious, the harm to the integrity of the trial is the same no matter which form the tampering takes.") Indeed, the Bail Reform Act also specifically states that the government or a judicial officer may consider whether detention is warranted where there is "a serious risk that [a defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Indeed, "obstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was instituted by the Bail Reform Act of 1984." Id. (citing United States v. Melendez–

5

Carrion, 790 F.2d 984, 1002 (2d Cir.1986) (noting that detention may be validly imposed where there is evidence of witness tampering); United States v. Payden, 768 F.2d 487, 490 (2d Cir. 1985) (applying the Bail Reform Act of 1966 and noting that the court had the power to detain defendant "if it found that his release posed a serious threat to the court's processes"); United States v. Acevedo–Ramos, 755 F.2d 203, 207 (1st Cir. 1985) (noting that the 1984 Act extends the scope of pretrial detention beyond risk of flight and obstruction of justice)).

### C. Procedural Considerations

The government is entitled to proceed by proffer in detention hearings. LaFontaine, 210 F.3d at 130-31. Bail hearings are "typically informal affairs, not substitutes for trial or even for discovery." Acevedo–Ramos, 755 F.2d at 206 (1st Cir.1985); see also United States v. Martir, 782 F.2d 1141, 1145 (2d Cir.1986) (bail hearing cannot become a "mini-trial" or "a discovery tool for the defendant").

## III. Argument

### A. There Is a Presumption that No Set of Conditions Will Adequately Assure the Safety of the Community or the Defendants' Appearance in Court

In this case, because the defendants are charged with a violation of Section 924(c), there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will reasonably assure the appearance of the defendants and the safety of the community if Defendant is released. See also United States v. Contreras, 776 F.2d 51, 54–55 (2d Cir. 1985) (holding that a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent finding of probable cause). Therefore, it is the defendants' burden to "introduce some evidence contrary to the presumed fact[s] in order to rebut the presumption." United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991). Even if the defendants satisfy this burden of production it does not disappear; rather, the presumption "remains a factor to be considered among those weighed by the district court." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

### B. The Nature and Circumstances of the Charged Crime Necessitate Detention

Based on the nature and seriousness of these charges alone, all three defendants should be detained. The kidnaping and gunpoint extortion plot involved crimes of violence and a firearm, and the facts of the plot demonstrate how vicious and dangerous these defendants are. The CW was lured by a person he trusted—his lawyer and friend—to a place he felt safe, all while being set up to be held at gunpoint. The CW believed he might

be shot that night, and there was a serious risk that he could have been. We do not know who provided the gun that was used by Beck and Padula that night, but all three defendants have admitted to having access to guns or have been seen with guns, as detailed further below in Section III(D).

Moreover, the defendants' use of their purported organized crime connections to further the fraud and to commit the kidnaping and extortion plot further demonstrates the danger posed by these defendants. The fraud itself and the defendants Luthmann's and Padula's exploitation of a disabled man to carry out their crimes also raises a serious risk that vulnerable victims could fall prey to them again if they were to be released on bail.

Additionally, all three defendants pose a risk of flight because of the lengthy sentences they face if convicted. Luthmann, Beck and Padula all face Guidelines' ranges of at least 151-188 months' on the kidnapping charge alone, in addition to a mandatory consecutive sentence of seven years for the Section 924(c) charge, for a total effective Guidelines range of 19-and-a-half to 22-and-a-half years' imprisonment. Luthmann and Padula face a further mandatory consecutive sentence of two years on the aggravated identity theft charges. All three defendants face a statutory maximum term of life imprisonment.

The facts of the fraud and the kidnapping and gunpoint extortion plot also demonstrate that Luthmann, in particular, wields enormous power by being a lawyer in that people place their trust in him, and if he were released on bail there would be a serious risk that he would abuse this position again. The nature and circumstances also demonstrate the risk that Luthmann will obstruct justice and tamper with witnesses given his attempts to obstruct the Commerce Department's investigation and his recommendation that the co-conspirators keep documents related to the fraud in his office because there generally are more approvals required before a search warrant can be sought for an attorney's office.

C.  The Weight of the Evidence

The evidence of the charged crimes is strong and includes witness testimony, phone records, emails, invoices, bank records and cell site evidence. Additionally, between February 2017 and June 2017, the CW made consensual recordings of Luthmann and Padula, during which they discussed their prior fraud and the potential of committing a new fraud. On a consensual recording of a meeting with Luthmann, after Luthmann had a falling out with Padula, Luthmann admitted, in sum and substance, that he had lured the CW to his office the night of December 5, 2016 at Padula and Beck's request and that he thought it was "a money issue." Luthmann said he did not know Padula and Beck were going to threaten the CW with a gun, but he said that before the CW arrived they told Luthmann "get the fuck out and don't tell anybody."

7

D.  The History and Characteristics of the Defendants

   i.  Luthmann

      (a) Other Threats of Violence and Gun Possession

Luthmann poses a serious risk of danger to the community, because in addition to his role in the kidnaping and gunpoint extortion of the CW, Luthmann has a history of using scare tactics and threats of violence to intimidate others. On at least two occasions, Luthmann has claimed to have a gun in his desk drawer. Luthmann has also told or implied to victims that the "Chinese mafia," Padula or a private investigator (the "Investigator"), who is a former New York City Police Department ("NYPD") detective and carries a gun, would hurt them on Luthmann's behalf.

Just two days ago, on December 13, 2017, Luthmann sent someone (the "Server") to John Doe 1's home at 2:00 a.m. to serve legal papers related to a lawsuit Luthmann filed against John Doe 1 (the "Facebook Lawsuit," described in more detail below). The Server, who John Doe 1 described as a large man with a Russian accent, did not identify himself, started banging loudly on John Doe 1's door, and John Doe 1, who was home with his wife and two teenage boys, called 911. While on the phone with 911, the banging on John Doe 1's door became so aggressive that it broke the inside doorframe. When the 911 operator heard the banging, the operator told John Doe 1's wife to hide in the attic with her children until the police arrived. Police were dispatched, but the Server left just before the police arrived. John Doe 1 and his wife saw the person who was at the door through the window. The next morning, John Doe 1 left for work and ten minutes after he

8

left, the Server again came to the door and taped papers to the door. John Doe 1's broken doorframe is depicted below.



John Doe 1 has been threatened by Luthmann before. In or around December 2016, John Doe 1, who runs a design business, was hired to do a project for the Investigator's daughter and she gave John Doe 1 a deposit. The Investigator's daughter later decided she no longer wanted to hire John Doe 1 and asked him to refund her deposit. John Doe 1 explained that the deposit was nonrefundable. With Padula present in his office, Luthmann then called John Doe 1, and told him that the Investigator would shoot him if he did not give him back the deposit and that Luthmann would not be able to control the Investigator. The Investigator later called John Doe 1 and said, in sum and substance, "I will run into you."

In or around Summer 2017, Luthmann and John Doe 1 had a falling out related to a fee dispute. While John Doe 1 was in Luthmann's law office, Luthmann left the room where John Doe 1 was sitting and a man who used to be Luthmann's doorman and works as his driver and bodyguard (the "Employee"), entered along with Luthmann's wife and demanded that John Doe 1 pay legal fees. John Doe 1 asked the Employee to move and he refused. They also had a dispute over John Doe 1's files, which Luthmann refused to

provide him. Shortly thereafter, Luthmann filed a police report against John Doe 1 claiming that John Doe 1 took certain files that contained Luthmann's work product, which led to John Doe 1's arrest for petit larceny. The case is still pending and an order of protection is in place prohibiting John Doe 1 from contacting Luthmann. On a consensual recording, Luthmann tells the CW that he "got" one of "George's [Padula's] friends arrested" and then confirms that it is John Doe 1.

In or around March 2016, Luthmann accused John Doe 2, a former employee of Luthmann's, who had worked as a contract attorney for Luthmann for approximately one year until January 2016, of stealing an autographed picture of former New York Mets pitcher, Tom Seaver. John Doe 2 thought Luthmann had gifted him the picture. Luthmann and John Doe 2 exchanged several emails, and then John Doe 2 received a phone call from one of Luthmann's employees stating, in sum and substance, that if John Doe 2 did not return the photograph, Luthmann and Padula were going to come to his house and beat him up. John Doe 2 referenced this threat in emails with Luthmann, and Luthmann called him a liar and threatened to have John Doe 2 arrested.

In or around May 2017, Jane Doe, a former client of Luthmann's, met Luthmann at a restaurant the night before he was to appear in court on a case he brought against Jane Doe's mother. Luthmann's wife was present at the table and Padula sat at a different table. Jane Doe had referred her mother to Luthmann to handle her father's estate, but Luthmann ended up in a fee dispute with Jane Doe's mother and refused to release the estate money, which he held in escrow. At that meeting, Luthmann referred to Jane Doe's brother coming to his office, implying Luthmann felt threatened, and then Luthmann stated that he (Luthmann) had a gun in his desk drawer. On a recording of this meeting, Luthmann's voice can be heard getting quiet just as he begins speaking about the gun, but the words "fucking desk drawer" are audible. Luthmann also mentions, in sum and substance, that he has the Investigator walking around his office with a gun, which can be heard on the recording.

The next day in court, while the parties were taking a break from an attempted mediation, Luthmann approached Jane Doe in a hallway, put his face an inch from hers and threatened to send the "Chinese mafia" to kill her brother. Jane Doe tried to calm Luthmann down and said that her mother's lawyer was going to go after Luthmann's license, and Luthmann stated that he would have the "Chinese mafia" rape and kill her female lawyer if the lawyer went after his license.

After that incident, Jane Doe limited her interactions with Luthmann, but had some conversations about pending cases Luthmann was handling for her and files of hers that he maintained. Because Jane Doe was afraid of Luthmann, she brought her secretary to Luthmann's office one time she had to meet with him. Luthmann told her that her secretary

10

could not stay with her and had several people, including his wife and someone matching the description of the Employee, block the secretary from entering his office.

On a consensual recording from in or around June 2017, Luthmann discussed a recent conflict he had with Padula and Beck and said he told one or both of them, "Next time you come at me, come heavy or not at all. I got a Glock waiting in my office drawer, and I got a shotgun right behind me, and you won't know the fucking difference when it hits you." Additionally, on December 13, 2015, Luthmann posted a picture of himself on his public Facebook page at a shooting range with the caption, "Very happy to be down south and at liberty to do some shooting. Nothing like a Glock 9MM." In another reference to shooting, on November 11, 2016, Luthmann posted a link on Facebook predicting that then-President-elect Trump would be impeached, and Luthmann captioned the post, "Now if Trump gets impeached, I'd be one of the people on Fifth Avenue shooting. Frankly, I'd be a monarchist at that point . . . and a justified killer."

A search was conducted today of Luthmann's office. A firearm has not yet been located, and in light of the fact that Luthmann has known he is under investigation for other possible violations of state law, it would not be surprising if he has secreted any gun he possesses to avoid it being found in a search. The likelihood that Luthmann possesses a firearm that he may have access to if he were released is yet another fact that necessitates detention.

(b)  Organized Crime Connections

In addition to the organized crime connection to the underlying facts of this case and Luthmann's repeated threats regarding the "Chinese mafia," Luthmann is also providing commissary funds at least two incarcerated associates of La Cosa Nostra, Luchese associate Joseph Cutaia and Gambino associate Gasper Marciante, as demonstrated through Western Union records. Cutaia is currently serving a 240-month sentence in federal prison for his participation in multiple violent robberies in which victims were threatened with guns and knives, and in some instances beaten and shot. Cutaia reported to his father, a Luchese family soldier and his grandfather, a Luchese family captain. Marciante is currently serving a 180-month sentence for his participation in a home invasion robbery where a woman was threatened with a gun and tied with tape and her husband was pistol whipped to the point that he has lasting brain damage. Both men regularly receive commissary funds from friends and family members. Cutaia and Marciante are also in regular communication with Padula, as described below in Part III(D)(ii).

(c) Risk of Witness Tampering, Including Harrassment of Rivals and Vindictive Lawsuits

Luthmann is a danger to the community and creates a serious risk of undermining the integrity of the trial process because, in addition to his threats of physical violence against his rivals, he has also become notorious for cyberbullying and engaging in social media campaigns against political and personal rivals. Furthermore, there is ample evidence to suggest that he has also used lawsuits, including one lawsuit brought in this district, to further his personal vendettas against his perceived enemies, especially when more traditional thug tactics have failed. These nonviolent retaliations can have the same chilling effect as violence and demonstrate the serious risk of danger Luthmann poses to the community and of witness tampering and obstruction. Indeed, many witnesses have expressed fear of Luthmann's reprisals if they speak with law enforcement. Furthermore, these types of actions also create a risk of non-appearance because he is willing to abuse the Court system.

1. Harrassment, Threats of Violence and Lawsuit Against John Gulino

One example of Luthmann's bullying campaigns has involved a long-standing public feud with John Gulino, Chairman of the Democratic Committee of Richmond County, which began with Luthmann's failed 2013 bid for Staten Island Borough President. His cyberbullying and threats of actual violence, as well as a lawsuit he filed all evidence the serious risk that Luthmann will be a danger to witnesses and risk the integrity of the trial process if he is released.

After Luthmann's failed bid, Luthmann launched an aggressive social media campaign against Gulino, which included, for example, purchasing cardboard cutouts of Gulino's likeness and posting a picture of one on Twitter with the comment, "#NewArrival just in time for #huntingseason life sized #targets for #targetpractice." Behind these social media postings, Luthmann was making actual plans to physically harm Gulino and Gulino's colleague. According to a confidential source, Luthmann asked Padula to beat up Gulino, and Luthmann also tried to hire Padula to kill Kevin Elkins, former executive director of the Democratic Committee of Richmond County. According to public reports, Elkins turned Luthmann away from a fundraising event hosted by Gulino.

After Luthmann was removed from the ballot, he brought a failed litigation aimed at invalidating petition signatures collected for Gulino. See Matter of Luthmann v. Gulino, 131 A.D.3d 136 (2nd Dept. 2015). Following his playbook of filing vindictive lawsuits, Luthmann also brought a lawsuit on behalf of a driver he employed, Lawrence Gilder, alleging that Gulino had discriminated against Gilder because he is African-American and Native-American by not interviewing him for the congressional seat left open after

Michael Grimm's resignation. <u>Gilder v. Gulino</u>, 15-CV-4094 (KAM). After Judge Matsumoto dismissed the lawsuit, Gulino moved for sanctions against Luthmann, Dkt. No. 49, which Judge Matsumoto denied by an order on the docket. Luthmann, however, admitted to the CW that this lawsuit was part of his attempt to harass Gulino.

        Additionally, in this same lawsuit, Luthmann filed a letter seeking to excuse his failure to timely file an amended complaint by claiming that mobsters had come to his office, whom he believed had been sent by Gulino. (Dkt. No. 25.) Luthmann stated, in sum and substance, that this experience left him crippled with fear and anxiety and unable to timely file. As defense counsel pointed out in its opposition to an extension of time, Luthmann attended several parties, as demonstrated by photographs Luthmann posted on social media, and filed other lengthy motions during the time period he said he was incapacitated and unable to file. Notably, Luthmann's letter claiming to have been threatened was written right at the peak of the scrap metal fraud, and Luthmann was actively facilitating financial transactions for the fraud scheme on the day the letter was written and over the previous two weeks. Therefore, there is evidence that Luthmann was lying to the Court, demonstrating that he is not only a danger and poses a serious risk of witness tampering, but also a risk of flight given his willingness to lie to the Court.

        2.       <u>Fake Facebook Pages and Harassment of Rivals</u>

        In August 2017, NY1 and the New York Times published articles revealing that Luthmann was the administrator of a number of Facebook pages made to fraudulently appear as if they belonged to Staten Island politicians including Janine Materna, Staten Island Council Member Debi Rose, Staten Island District Attorney Michael McMahon, and New York State Assemblywoman and former Republican nominee for mayor, Nicole Malliotakis. According to the reports, the Facebook pages in fact were created and maintained by Luthmann and endorsed positions that would be at odds with those politicians' constituents. Before the source of the pages was revealed in the media, Materna had filed a police report stating that the Facebook page had resulted in her receiving death threats. In a public Facebook post on his own page, Luthmann admitted his role in the Materna page and defended his actions as "dirty tricks," inherent to politics. He also stated, "My political Bible was written by Roger Stone. I am a bear with the taste of blood in my mouth. I am a man-eater."

        Articles also publicized private Facebook messages sent between Luthmann and Ron Castorina, who was running against Materna for state assembly. These messages further show the level of harassment that Luthmann is capable of and the danger he poses to the community, including the risk of witness tampering. In those messages, according to the New York Times, Luthmann sent Castorina a photoshopped image of Materna's face superimposed over a pornographic image, making it look as if Materna was performing a sex

act and discussed, in sum and substance, posting the image to the internet. When Castorina expressed concern about the image being posted, Luthmann stated, "Dark web. Untraceable IP."

According to NY1, in another private message with Castorina, Luthmann sent Castornia a lewd photoshopped image of Malliotakis. Luthmann also told Castorina he was going to bring a water gun to a picnic where Malliotakis was going to be present and stated, "I'm bringing a super-soaker to the South Beach Civic Association Picnic tomorrow . . . Wet tees! Nicole will not be happy!" Remarkably, in publicly available Facebook postings on Luthmann's Facebook page, Luthmann can be seen aiming a water gun at Malliotakis at the same picnic, and NY1 reports that Malliotakis was sprayed by Luthmann at the picnic. Moreover, according to NY1, in another private message to Castorina, Luthmann referenced an anti-Semitic slur he used when speaking to Board of Elections General Counsel Steven Richman saying, "I called Steve Richman a Jew-Rat . . . But passed it off as mispronounced Jurat . . . It's not like there is a Jew-rat right in front of me." These Facebook messages evidence public actions Luthmann has taken to humiliate his rivals, including through sexual harassment, which creates a more traditional risk of danger as well as evidences a heightened risk of witness tampering and obstruction. Further evidencing the risk of witness tampering in this case and the danger to the community Luthmann poses, and again following his playbook of using the courts to attack his enemies, after these articles were published, Luthmann filed the Facebook Lawsuit against NY1, Padula and others he claimed were behind the reports.

        3. <u>Lawsuits and Attempted Rape Allegations Against District Attorney McMahon</u>

Luthmann has also used the Courts to write disparaging things about his political enemies District Attorney McMahon and his wife, Justice Judith McMahon, now assigned to the New York Supreme Court, including in filings that had nothing to do with them like a lawsuit Luthmann filed for John Doe 1 about a foreclosure on John Doe 1's house. Luthmann's treatment of the McMahons further evidences the risk of witness tampering in this case. In addition to the lawsuits, a confidential source has revealed that Luthmann approached people offering them money if they would claim that Justice McMahon had sought bribes from them in order to "swing" cases.[3] The same confidential source also stated that when District Attorney McMahon was running for the office he now

---

[3] Luthmann currently represents a law clerk who secretly recorded conversations with several Staten Island judges and court personnel. He has filed a $2.9 million dollar against Justice McMahon and others that includes allegations that she steered certain cases away from "defense friendly" justices as a favor to her husband. <u>Pulizotto v. McMahon, et al.</u>, 17-CV-9726 (PKC) (S.D.N.Y.)

holds, Luthmann tried to pay an exotic dancer $10,000 to say that District Attorney McMahon had raped her years ago. Luthmann confirmed to the CW that he had tried to pay an exotic dancer to say she had been raped by one of Luthmann's political rivals, but the CW does not remember which rival. Furthermore, Luthmann suggested to the CW that he hire an exotic dancer to say she had been raped by someone with whom the CW was having a conflict.

        (d)    <u>Arrest and Flight from Scene</u>

In September 2013 Luthmann was arrested on one felony count of aggravated driving while intoxicated and two misdemeanor counts of driving while intoxicated. According to the criminal complaint referenced in public reports, Luthmann crashed his car into a guardrail around 3:30 a.m. and his blood alcohol content measured at .183 percent, more than twice the legal threshold in New York. Approximately two months after Luthmann's arrest, prosecutors dropped the charges against him and a spokesman for then-Richmond County District Attorney Daniel Donovan stated that it was because they were unable to gain an eyewitness's cooperation. The witness identified in the complaint has since been interviewed by an agent from the Federal Bureau of Investigation ("FBI"), and described seeing Luthmann crash into the guardrail and then run and hide behind a car. The witness stated that he pointed out Luthmann to the police when they arrived on the scene. This behavior goes both to Luthmann's risk of dangerousness and his risk of flight.

        ii.    <u>Padula</u>

In addition to the charged conduct, Padula has a history of violent threats, as set forth above in relation to the threats made to John Doe 2 and Jane Doe (where he stood watch during Luthmann's meeting with Jane Doe), and as described by an additional witness. Padula also does have organized crime connections, as mentioned above, which raise a serious risk of dangerousness in light of the fact that he has purported to rely on organized crime connections to commit fraud and violence. Padula is actively communicating with Cutaia and Marciante, and in an attempt to conceal his name, his phone number is associated with fake names on both of their contact lists. This behavior goes not only to risk of dangerousness, but also to risk of flight and risk of witness tampering, given his untrustworthiness and either his or his associate's attempts to defraud the Bureau of Prisons.

Furthermore, in 2012 Padula was arrested after selling an AK-47 and a revolver to a cooperating witness. Although charges were not brought, the government posesses evidence of the sales, including photographs of the recovered firearms and audio recordings of the gun buys. A witness has also stated that the witness saw Padula with a gun on two other occasions, and that on another occasion Padula claimed to have "shot up" a

store on Staten Island. A search of Padula's residence is still being conducted, and the government will update the Court on recovery of any firearms.

    iii.    <u>Beck</u>

Beck's risk of dangerousness and flight is based primarily on the offense conduct, where he was the one who pointed the gun at the CW and told Padula to shoot the CW in the knee before leaving the room. Additionally, during the fraud conspiracy, Luthmann and Padula represented Beck as an enforcer for organized crime and his violent actions towards the CW corroborate the truth of those statements. Furthermore, Beck has a criminal history. In 1981 Beck was convicted of Criminal Sale of a Controlled Substance in the 2nd Degree and sentenced to 4 years to life in prison. Notably, the charges on which he was arrested also included Criminal Possession of a Weapon in the 4th Degree.

CONCLUSION

The charged conduct in this case involves violence, threats based on organized crime, and the use of mafia-style tactics. Based on the indicted crimes alone, no set of bail conditions can mitigate the attendant risk of dangerousness as to these defendants who have ready access to guns, and connections to organized crime. Additionally, Luthmann has made threats of violence against at least one of the potential witnesses in this case, John Doe 1, within the past week by sending the Server to John Doe 1's home at 2:00 a.m., frightening the family to the point that police were called and a woman was forced to hide in her attic with her children. Luthmann has also made other threats of violence including threats to have members of Chinese organized crime kill and rape people and has attempted to destroy people's lives by having them accused of rape.

Furthermore, the risk of obstruction or witness tampering is great based on Luthmann and Padula's threats of violence. Additionally, aside from the danger of violence, the danger that Luthmann will obstruct justice or intimidate witnesses is insurmountable unless Luthmann is incarcerated. Every witness the government has interviewed has expressed fear of Luthmann—ranging from fear that he will harm them physically to fear that he will ruin their reputations through frivolous lawsuits or online threats. Given that it is often impossible to remove misleading or untrue information about oneself from the Internet, the threat of having vicious rumors or embarrassing secrets posted online can have as much of a chilling effect on potential witnesses as any physical threat.

The risks of dangerousness and obstruction would remain even with electronic surveillance and home confinement. <u>See</u> <u>Orena</u>, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted). There is also a serious risk of

16

flight in light of the steep sentences the defendants face and their untrustworthiness. There is no condition or combination of conditions that will assure the safety of the community, the defendant's return to court, their compliance with the Court's directives or the integrity of the trial process.

       Based on the foregoing, the government respectfully requests that the defendants be permanently detained pending trial.

       Respectfully submitted,

       BRIDGET M. ROHDE
       Acting United States Attorney

By:   /s/_____
      Moira Kim Penza
      Assistant U.S. Attorney
      (718) 254-6454

cc:    Defense Counsel