

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AL: MKP
F.#2017R00050

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 28, 2018

<u>By ECF and Email</u>

The Honorable Vera M. Scanlon
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    United States v. Richard Luthmann, <u>et</u> <u>al.</u>
             Criminal Docket No. 17-664 (JBW)

Dear Judge Scanlon:

        The defendant Luthmann in the above-captioned case has advised that he intends to move for bail on February 28, 2018 at 11:00 a.m. and has filed a letter in support of that motion. (Dkt. No. 74, "Defendant's Letter"). The government respectfully submits this letter in response to the Defendant's Letter and in further support of a permanent order of detention, which is consistent with the recommendation of Pretrial Services.[1]

    I.    <u>The Indictment Establishes Probable Cause and a Presumption in Favor of Detention</u>

        As an initial matter, the first seven pages of the Defendant's Letter should be disregarded in their entirety. They are nothing more than an attempt to goad the government into trying its case now based on self-serving statements made by Luthmann to his counsel, untested by and shielded from cross-examination. It is well-settled that this type of mini-trial is entirely inappropriate where a grand jury has already returned an indictment against a defendant. <u>See</u>, <u>e.g.</u>, <u>United States v. Contreras</u>, 776 F.2d 51, 53 (2d Cir. 1985) ("[W]e hold that a grand jury indictment cannot be undermined by an

---

[1] The government submitted an initial letter in support of the defendant's detention on December 15, 2018 (Dkt. No. 6). It is attached here as Exhibit 1.

independent judicial determination finding no probable cause in the context of a detention hearing.") (internal quotations and citations omitted).  An "indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause . . . without further inquiry." Id. (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975)); see also Sciortino v. Zampano, 385 F.2d 132, 133 (2d Cir. 1967) ("A post-indictment preliminary examination would be an empty ritual, as the government's burden of showing probable cause would be met merely by offering the indictment.")

Furthermore, a post-indictment examination of probable cause should not be allowed to serve as an improper and de facto discovery tool.  "It is most unlikely that having provided carefully for a limited discovery in [the Federal Rules of Criminal Procedure,] the draftsmen intended that the discovery adventitiously attached to the preliminary hearing should constitute a further right of the accused." Zampano, 385 F.2d at 134; see also United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) ("[A] detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant.") (citation omitted).

Therefore, despite Luthmann's arguments to the contrary, the Court should start its analysis by accepting that the indictment (attached here as Exhibit 2) is sufficient, on its own, to establish probable cause.  This includes finding that there is probable cause to believe that the defendant used a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) and that, therefore, a presumption in favor of detention exists under 18 U.S.C. § 3142(g). Contreras, 776 F.2d at 54. ("Were an evidentiary hearing addressing the existence of probable cause required in every § 3142(e) case in which an indictment had been filed, the court would spend scarce judicial resources considering that which a grand jury had already determined, and have less time to focus on the application of the presumptions and the § 3142(g) factors in deciding whether the defendant should be detained.").

II. The Defendant's Version of Events is Plainly Contradicted by the Evidence and Shows He is Now Lying to the Court

The government does not intend to dispute the Defendant's Letter point-by-point and is unwilling at this time to reveal its witnesses or their anticipated testimony, which is information protected by 18 U.S.C. § 3500.  That being said, the government does wish to draw the Court's attention to two blatant fabrications, which are representative of the many lies Luthmann is now putting before the Court.

First, in the Defendant's Letter, the defendant devotes nearly an entire page to refuting the government's allegations regarding his conspiring to defraud Doe Company 1.  The Defendant's Letter states that Luthmann "agreed to act as escrow agent" for the transaction and was wired $31,500 from Doe Company 1 on or about October 2, 2015, which he immediately remitted to the CW.  According to the Defendant's Letter, because "scrap metal loads take up to six to eight weeks to reach Asia[,] . . . based on representations made by CW" the defendant was "under the belief that the contract between CW's company and Doe Company 1 was executed without incident."  Indeed, the defendant claims he had no

2

idea there was an issue with Doe Company 1 until "late November." In truth, however, just days after the deposit was wired to Luthmann's IOLA account, a representative of Doe Company 1 (the "Representative") went to Luthmann's law office to complain he had been defrauded.

In an email chain (attached as Exhibit 3) that includes Luthmann, one of Luthmann's co-conspirators, using an alias, emailed the Representative on October 8, 2015 and said, "Commercial Metals NY attorney Richard Luthmann has informed me that you came to his office and caused a scene, which upset his support staff . . . . We do not appreciate you going to places we do business unannounced and then claim that we defrauded you to law enforcement authorities." The Representative responded the same day, copied Luthmann on the email, and said, "I went to Mr. Luthmann's office because the deposit was sent to his custardy [sic.] pending our loading of the two containers . . . . I was forced to seek help from the DA's office. At this moment per our contract I'd just like your attorney to return the funds to me. . . ." Luthmann then responded, also the same day telling the Representative, "there never was any Escrow Agreement." This timing is completely contrary to the representations made in the Defendant's Letter, and Luthmann's refusal to characterize himself as an escrow agent to the Representative contradicts his current assertion to the Court. Additionally it is worth noting that this email chain comes nearly a month before Luthmann and his co-conspirators opened the fraudulent bank accounts and defrauded additional victim companies out of approximately half a million dollars.

Second, in the Defendant's Letter, Luthmann claims that it was the CW who "convinced" the person referred to in the Indictment as the "Client" to "act as the President and signatory of Omni." Luthmann says this was done "without [Luthmann's] knowledge" and that when he "eventually" found out he confronted the Client and the CW. However, as alleged in the Indictment, just ten days after the first bank account was opened in the Client's name, Luthmann deposited a $22,500 check, made out to his IOLA account, which had been signed by the Client. (Indictment ¶ 24.) Furthermore, on a consensual recording made on February 16, 2017, Luthmann discussed the Client with the CW and the CW said, "I don't know if I ever met him." Rather than saying, "Of course you did . . . you set him up as the President of Omni," as one would expect if the Defendant's Letter were accurate, Luthmann said, "You know, you know who I'm talking [about]. . . he's crazy." The CW then says, "Kind of. I remember seeing him in your office" and Luthmann replied, "That's right. He was always there. He would never leave."

### III. The Defendant Has Connections to Organized Crime

As set forth in the government's initial detention letter, Luthmann has ties to organized crime. Since the initial letter, the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, made a finding that Luthmann's co-defendant, George Padula III "is involved with people who are associates of organized crime and as such he has the means . . . to exploit whatever influence he has with people who have influence of that nature," and subsequently held that there was clear and convincing evidence to find

3

Padula III a danger to the community and that no combination of conditions that would adequately assure the safety of the community. (Dkt. No 50, transcript dated January 26, 2018 at 35-36.[2]) This finding corroborates the indictment's allegations regarding organized crime and further supports a finding that Luthmann, who was willing to use an associate of organized crime to further his criminal ends, is a danger to the community and presents a risk of obstruction. Indeed, Luthmann's own admission in the Defendant's Letter that he represented Padula in his arrest for firearms trafficking further supports Luthmann's knowledge of Padula's organized crime connections and the foreseeability of Padula using a firearm on December 5, 2016 to extort the CW. Furthermore, Luthmann's claims that his provision of commissary funds to known members and associates of organized crime is a routine part of his legal practice ignores: (1) that Joseph Cutaia and Gasper Marciante are the same La Cosa Nostra associates Padula III was communicating with, and (2) that Luthmann does not regularly practice criminal law and he never actually handled any legal matters for these associates.

> IV. The Court Should Accept the Government's Proffer Regarding Threats of Violence, Access to Guns and Harassment

As set forth in the government's initial detention letter, Luthmann has made numerous credible threats of violence, and on at least two recordings he referenced his access to guns. Luthmann's attempts to refute the allegations should be disregarded. As to John Doe 1, the government did mistakenly state that the incident with the process server occurred at 2:00 a.m., when in fact it occurred around 8:00 p.m.[3] However, that does not negate the fact that the process server acted in an aggressive manner and that John Doe 1's wife called 911 because she was frightened for her and her sons' safety, as corroborated by 911 records. John Doe 1 was not even home at the time of the incident, so the idea that John Doe 1's wife would have fabricated the incident, foreseeing how it could be used in a future detention hearing against Luthmann, is incredible. Luthmann self-serving statements, through his counsel, do nothing to otherwise discredit the threats of violence or harassment (including through litigation) of his perceived enemies as set forth in the government's initial letter.

> V. Luthmann's Proposed Bail Package is Insufficient

Luthmann has proposed a $1,000,000 bail package with $500,000 secured. This is woefully short of the $1.5 million dollar, fully secured bond on which Luthmann's co-defendant, Michael Beck, is released. The government has not yet had the opportunity to interview the proposed suretors, but based on Luthmann's jail calls, they are not financially suitable, making the dollar amount of the bond worthless. Luthmann's wife is currently unemployed and Luthmann has stated on multiple calls

---

[2] The transcript is not attached as an exhibit but the government can provide a copy if the Court wishes.

[3] This mistake did not involve any false or inconsistent statements by any government witness but was rather the result of a miscommunication between the government and the FBI.

that he (presumably with his wife) may have to declare bankruptcy. (See, e.g., call dated December 19, 2017 at 8:05 p.m.; call dated January 24, 2018 at 2:11 p.m.).[4] Indeed, on a call between Luthmann and his mother during which she was urging him not to sign any paperwork from his former lawyer he said, "I'm gonna be declaring bankruptcy . . . so I'll sign for . . . fucking $5 million dollars. What do I care?" (Call dated December 23, 2018 at 9:07 a.m.) This attitude reflects why the dollar amount of the bond here is meaningless. Additionally, on several jail calls between Luthmann and his mother, Luthmann's mother expressed that she is currently having financial difficulties. She stated she has "no money" and that she has had to refinance her house to pay Luthmann's legal fees. (See, e.g., call dated, January 25, 2018 at 12:55 p.m.) She also is anticipating paying at least between $200,000 and $250,000 in legal fees (along with help from her parents) for Luthmann. (See, e.g., call dated, December 27, 2017 at 11:19 a.m.) Luthmann's mother's husband, who is also a proposed suretor, filed bankruptcy himself in 1991.

       Furthermore, the degree of moral suasion his wife, who is the only proposed suretor other than his mother and her husband, currently holds over Luthmann is unclear. A confidential witness stated in the past few weeks that Luthmann's wife had left him and she was believed to have moved out of her marital apartment in Staten Island for at least some period of time. While Luthmann's wife may be standing by him today, the stability of their relationship is questionable. Throughout the jail calls, Luthmann expressed disappointment that his wife had retained her own counsel, was demonstrating concern about her own criminal liability[5] and was unwilling to do certain things Luthmann was asking her to do (in order to wind down the law practice or further his own case) at the direction of her counsel. (See, e.g., call dated February 13, 2018 at 7:12 p.m.) Luthmann has also used vulgar words to describe his wife and her family on jail calls. On one call he said, "My [expletive] my [expletive] wife, get divorce papers ready because she hasn't called me." (Call dated January 18, 2018 at 12:21 p.m.) On another call, Luthmann blamed issues with his law office on his wife and said, "This is [wife's name], [wife's name] fucked this whole thing up . . . tell [wife's name] to pick up the pieces or get divorce papers." (Call dated January 21, 2018 at 2:05 p.m.) On the same call, Luthmann's mother asked him to inquire as to whether his wife's family is going to put any money towards his bail package, and he said he would not ask her because if she said no it would "end in divorce." (Id.) Luthmann also called his wife a "fucking idiot" and called his wife's mother "a fucking stupid [expletive]." (Id.) In

---

[4] All calls have been provided to defense counsel in discovery, although some were only provided last yesterday, in part given the timing of MDC's production to the government. The government is prepared to provide the Court with copies of any calls it would like to hear.

[5] Luthmann's wife worked in Luthmann's law office for some period of time. Based on confidential sources, she sent false billing statements to former clients and encouraged Luthmann to use aggressive billing collection tactics. Also, as stated in the initial detention memo, Luthmann's wife was present at the meeting where Luthmann told Jane Doe he had a gun.

5

light of these statements, there is a significant risk that the defendant's wife's signature on a bond is meaningless and will not dissuade the defendant from fleeing, from posing a danger to the community or from obstructing justice.

The defendant's risk of flight also cannot be discounted. On several calls, Luthmann seems resigned to not being a lawyer once his criminal case is over and has considered alternative careers including coding and screenwriting. (See, e.g., call dated December 25, 2017 at 2:36 p.m.) Also, although he had been a fixture in Staten Island before his arrest, Luthmann has discussed relocating to South Carolina, Texas or Arizona when the case is resolved. (See, e.g., call dated December 29, 2017 at 10:24 a.m.).

Moreover, the defendant's offer to not use social media is of no comfort to the government. The defendant is technologically savvy, familiar with the "dark web" and able to create fake social media profiles. The defendant has many ways to technologically harass or intimidate people if he so desires, and as Judge Pohorelsky found when he denied Padula III bail over concerns about possible witness tampering, the government should not have to go to "extraordinary lengths" to ensure that tampering does not happen.

For the forgoing reasons, and the reasons set forth in its initial detention letter, the government respectfully requests that that Court find that there is no set of conditions that will assure the defendant's appearance, protect the safety of the community or mitigate the risk that the defendant will obstruct justice.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: _____/s/_____
Moira Kim Penza
Assistant U.S. Attorney
(718) 254-6454

cc: Clerk of Court (VMS) (by ECF)
Defense Counsel (by ECF)