

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS:JPM
F. #2017R00050

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 30, 2019

<u>By ECF and Hand Delivery</u>

The Honorable Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Richard Luthmann
               <u>Criminal Docket No. 17-664 (JBW)</u>

Dear Judge Weinstein:

        The government respectfully submits this letter in advance of the defendant Richard Luthmann's sentencing, which is scheduled for September 5, 2019. The defendant, a prominent Staten Island attorney, abused his law license and conspired to commit fraud and extortion. His crimes victimized his own clients, for the principal purpose of enriching himself. A sentence between 57 and 71 months, which was contemplated by the parties in the plea agreement, and is a sentence that the Government submits is correct under the advisory sentencing Guidelines, is warranted for these crimes.

I.      <u>Factual Background</u>

        The defendant was born and raised in Staten Island. <u>See</u> Presentence Investigation Report ("PSR"), ¶ 80. The defendant graduated from Columbia University and attended law school in both New York and Miami, receiving two graduate degrees in 2004 and 2005, respectively. PSR ¶¶ 102-103. The defendant first practiced law in February 2010 at a law firm in northern New Jersey. PSR ¶ 110. After six months, he founded The Luthmann Law Firm PLLC (the "Law Firm"), which was located in Staten Island. PSR ¶ 109. According to his website, the Firm was "a boutique solo law firm possessing the skills, talents and experience to provide advice and representation to individuals, families, fiduciaries and entrepreneurs in the fields of estate planning, tax and business planning, asset protection and a multitude of ancillary legal areas that satisfy specific client needs." <u>See</u> Exhibit A: Luthmann Law Firm Website.

It was through his law practice that the defendant met the clients who would become his co-conspirators. The defendant, through his legal representation of these individuals, became familiar with their unscrupulous business practices and, then, decided to partake in those practices. First, he met Co-Conspirator #1, who had worked for decades in the scrap and recycling businesses. PSR ¶ 10. Co-Conspirator #1 engaged the defendant to represent him in a number of civil suits arising out of a scrap metal business Co-Conspirator #1 operated. PSR ¶ 10. Co-Conspirator #1 was, among other things, subject to various claims against him for misleading or defrauding purchasers of scrap metal, and the defendant represented Co-Conspirator #1 in such matters. PSR ¶ 10.

In 2015, the defendant obtained local notoriety (including being featured on the cover of the New York Post) after he filed a motion in Richmond County Supreme Court seeking <u>trial by combat</u> against an adversary. It was around this time that the defendant introduced his client, Co-Conspirator #1, to George Padula, III ("Padula"). PSR ¶ 11. The defendant had met Padula's family through his law practice as well. The defendant told Co-Conspirator #1 that Padula's family was involved in the garbage transfer business. PSR ¶ 11.

The defendant suggested that he, Co-Conspirator #1, and Padula go into the scrap business together. PSR ¶ 11. The defendant's proposal, however, was not to establish a legitimate scrap and recycling business; instead, the conspirators agreed that they would make contracts to sell scrap metal, receive money from the customer, and then fail to make delivery of the product. PSR ¶¶ 12-13. The defendant told Co-Conspirator #1 that Padula, who had no experience in scrap metal, was a good person to involve in the fraud because Padula's family has organized crime connections. PSR ¶ 12.

In August 2015, the defendant registered two companies with the New York Department of State – Commercial Metals NY ("Commercial") and Omni Metal Corporation ("Omni") to use to carry out the fraudulent scheme. The defendant chose these names purposely; the company names closely matched legitimate scrap and recycling businesses, and he wanted potential customers to confuse his fraudulent companies for the real ones. PSR ¶ 13-14. Indeed, at least one victim customer later told the government that the company believed it had contracted with the legitimate Omni company.

In early October 2015, Commercial made a contract with Kanamax International ("Kanamax") to sell scrap metal. PSR ¶ 15. Kanamax wired $31,500 to the defendant's attorney IOLA escrow account. PSR ¶ 15. This was one of many blatant rule attorney ethical violations the defendant engaged in during the scheme. <u>See</u> N.Y. Rule of Prof. Resp. 1.15, 22 N.Y.C.R.R. Part 1200. What is clear is that by having the defendant as a face of the company, including by using his letterhead for correspondence, transferring funds to an attorney's account, and using his "status" as an attorney for any contractual issue, the conspirators sought to varnish their scheme and use the defendant's law license as both a sword and shield. After Kanamax's money was deposited into the defendant's account, the conspirators withdrew it and made no deliveries to Kanamax; in effect, they stole $31,500. PSR ¶¶ 15-16. Kanamax then threatened Commercial with criminal charges and the conspirators decided to return the $31,500. PSR ¶ 17.

2

Remarkably, the lesson taken by the defendant from the Kanamax fraud was that he and his partners needed to be significantly more deceitful if their scheme was to succeed. To do this, the defendant, Padula, and Co-Conspirator #1 began operating under the Omni name. PSR ¶ 17. They also began using aliases when interacting with customers; hired a figurehead president of the company; and began laundering the proceeds of the fraud through various banks. PSR ¶¶ 18-23. The defendant came up with an idea to make his client "R.D.", who is blind and under the care of a guardian ad litem, the nominal president of the scrap metal company. PSR ¶ 21. The defendant had met R.D. because R.D. would panhandle outside of the defendant's law office. The defendant informed his co-conspirators that R.D. could not be sued because he was mentally handicapped and that if they were ever sued only his client would be liable. R.D., whose identity was effectively stolen by the defendant and other conspirators, will be present at sentencing to provide a victim-impact statement.

Several banks refused to open an account for Omni, but eventually Northfield Bank opened one. PSR ¶ 23. Then Israel Discount Bank ("IDB") opened an account based on the defendant's referral. PSR ¶ 23. The defendant stated that IDB was a better bank to use because it is smaller and, in his opinion, has fewer compliance procedures; indeed, most of the Omni transactions passed through IDB without incident. R.D. was taken by another co-conspirator ("Co-Conspirator #3") to the various banks to conduct transactions during the scheme.

It was through Omni that the conspirators were able to quickly and effectively execute the fraudulent plan. Under the new fraudulent scheme, the conspirators would contract to sell valuable scrap metal to buyers located abroad (usually in China) but then to ship them worthless filler materials. PSR ¶ 20. The Omni fraud operated from a warehouse in Staten Island. PSR ¶ 19. At the warehouse, Co-Conspirator #1, Padula, Co-Conspirator #3 and others would meet with potential buyers for scrap metal and show them product that was purportedly for sale and immediate shipment. The customers would then make a contract to buy the scrap metal, with delivery to be made abroad. Before the shipments were sent abroad, which would be done through shipping containers on freight boats, the conspirators would replace the scrap metal the buyer had seen and agreed to purchase with cheap, heavy filler material (such as concrete or dirt). The conspirators would cover the worthless filler material with just enough valuable scrap metal necessary to hide the garbage below it. To cover their tracks, they took photos and arranged the boxes being shipped so that it would appear as if the containers only were filled with valuable scrap metal.

Because the fraudulent scheme would be discovered once the shipping containers reached China, the conspirators had to work quickly to make as many "sales" as possible before any shipments arrived. In just a few weeks, they were able to make over $484,000 in fraudulent sales, broken down as follows:

| Customer/Victim Name | Date | $ Amount | Funded Into Account | Bank |
|---|---|---|---|---|
| AMG Resources Corp | 11/19/2015 | $156,015.90 | OMNI Metal Corp | IDB |
| AMG Resources Corp | 11/25/2015 | $24,219.12 | OMNI Metal Corp | IDB |
| | | $180,235.02 | | |
| GDB International Inc. | 12/01/2015 | $116,793.26 | OMNI Metal Corp | IDB |
| GDB International Inc. | 11/25/2015 | $50,176.37 | OMNI Metal Corp | IDB |
| | | $166,969.63 | | |
| Civil Metals Inc. [1] | 11/23/2015 | $57,457.74 | OMNI Metal Corp | IDB |
| JC Horizon Ltd (DBA Li Tong Int) | 11/04/2015 | $11,862.15 | OMNI Metal Corp | Northfield |
| JC Horizon Ltd (DBA Li Tong Int) | 11/06/2015 | $12,401.42 | OMNI Metal Corp | Northfield |
| JC Horizon Ltd (DBA Li Tong Int) | 11/06/2015 | $23,556.89 | OMNI Metal Corp | Northfield |
| | | $47,820.46 | | |
| Kanamax International Inc | 10/02/2015 | $31,500.00 | Luthmann Law Firm PLLC (IOLA) | Santander |
| JLJ International Holdings LLC | 11/13/2015 | $11,084.96 | OMNI Metal Corp | IDB |
| JLJ International Holdings LLC | 11/13/2015 | $11,285.43 | OMNI Metal Corp | IDB |
| | | $22,370.39 | | |
| UVA Recycling Inc | 02/03/2016 | $10,000.00 | OMNI Metal Corp | TD |
| Kanamax International Inc (REFUND) | 11/23/2015 | ($31,500.00) | Luthmann Law Firm PLLC (IOLA) | Santander |

    The payments from customers were transferred to the IDB account in R.D.'s name. From there, approximately $191,020 was transferred to the defendant's accounts. Additionally, the bank records (and corroborating records from Intuit) show that the defendant charged over $15,000 using the debit card attached to the IDB Account. Email records also show the defendant actively involved in monitoring and covering up payments; for instance, the defendant responded to an IDB inquiry about the Omni account claiming that certain transfers to his account were to pay for materials and that he earned a total of $20,000 in legal fees.

    The defendant, Padula, and Co-Conspirator #1 would meet at the defendant's law office to divide proceeds and discuss the scheme. In addition to making money from the fraud directly, the defendant demanded legal fees from Co-Conspirator #1 that the defendant said he was owed for work he did for the Co-Conspirator #1. In January 2016, while Co-Conspirator #1 was recovering from heart surgery, Padula visited Co-Conspirator #1 and informed him that the defendant wanted his legal fees paid. PSR ¶ 35. Co-Conspirator #1 gave Padula money for the defendant but was short approximately $7,000. PSR ¶ 36. Padula agreed to loan Co-Conspirator #1 the $7,000. PSR ¶ 36.

    It was at this point, in early 2016, that the fraudulent scheme for Omni began to unravel. Various customers in China had received the shipping containers full of concrete and other trash and contacted U.S. law enforcement authorities, who commenced the instant investigation. The conspirators from the Omni fraud also began to go their separate ways,

with Co-Conspirator #1 starting a new fraudulent scheme and cutting Padula out. Nevertheless, the defendant continued to pressure Co-Conspirator #1 for money, eventually concocting a false story that individuals from China had shown up at the law office, one with a gun, looking for Omni's offices.  PSR ¶ 37.  The defendant told Co-Conspirator #1 that his private investigator said these men were linked to Chinese organized crime groups.  PSR ¶ 37  The defendant and Padula told Co-Conspirator #1 that they had hired co-defendant Michael Beck, who they described as an enforcer, to conduct a "sit down" with the men.  PSR ¶ 37.  In order to get more money from Co-Conspirator #1, the defendant and Padula asked for $23,000 for Beck ($3,000 as a show of good faith and then $20,000 for the actual "sit down").  PSR ¶ 37.  After Co-Conspirator #1 paid, the defendant told Co-Conspirator #1 that Beck had resolved the matter.

In December 2016, the defendant, Padula, and Beck commenced a new extortion scheme against Co-Conspirator #1.  The scheme, as described below, played out in a bizarre fashion and the genesis appears to have been the defendant and Padula's insatiable appetite for easy money.  On December 5, 2016, the defendant contacted Co-Conspirator #1 to ask him to meet at the Law Firm under the guise of having Co-Conspirator #1 sign some legal paperwork.  PSR ¶ 38.  When Co-Conspirator #1 arrived, the defendant was not present; indeed, records show he was already scheduled to attend a social event in Staten Island at that time.  Co-Conspirator #1 contacted the defendant about his whereabouts, and the defendant told Co-Conspirator #1 to wait inside the office.  PSR ¶ 38.  While Co-Conspirator #1 was waiting, Padula and Beck entered the office, and Beck pulled out what appeared to be a handgun and aimed it at Co-Conspirator #1's head and knee.  PSR ¶ 38.  Beck told Co-Conspirator #1 that the money Padula had previously owed to Padula was <u>now</u> owed to Beck, who had added a $3,000 "vig," or interest payment, making it a total of $10,000.  PSR ¶ 38.  Eventually, both Padula and Beck left the Law Firm and did not further harm Co-Conspirator #1.

II.      <u>Procedural History and Obstruction of Justice</u>

On November 30, 2017, a grand jury indicted the defendant on eleven felony counts related to fraud, kidnapping, identity theft, and firearms offenses.  Counts One through Six of the indictment charge the defendant with wire fraud conspiracy, aggravated identity theft, money laundering conspiracy, and access device fraud in connection with the scrap metal fraud scheme and his use of the debit card to make unauthorized withdrawals from the IDB account.  Counts Seven through Eleven of the indictment charge the defendant with kidnapping conspiracy, kidnapping, extortionate collection of credit conspiracy, extortionate collection of credit, and using and possessing a firearm in connection with a crime of violence.  These latter charges stem from the defendant's extortion of Co-Conspirator #1, ultimately ending in the December 5, 2016 gunpoint incident in the Law Firm.

On December 15, 2017, the defendant, Padula and Beck were arrested.  The defendant was ordered detained pending trial.  <u>See</u> ECF Dkt. Nos. 8, 9 & 22.  On March 17, 2018, the defendant moved before the Honorable Vera M. Scanlon, United States Magistrate

5

Judge, for pretrial release and was released, over the government's objection, on a $1,500,000 bond secured by two properties and three IRA accounts owned by his mother and stepfather. See ECF Dkt. No. 89. The defendant was placed on home detention under restrictive conditions. The bond included the conditions that the defendant not have any contact with witnesses outside the presence of counsel, and that the defendant not violate any federal, state or local law while on release.

On April 26, 2018, one of the defendant's attorneys contacted the attorney of a potential witness (the "potential witness") and told the attorney, in sum and substance, that if the lawyer provided assurances that the potential witness was not cooperating with the government, a lawsuit between the potential witness and the defendant would go smoothly, and implied that if the potential witness cooperated with law enforcement the lawsuit would be made difficult.[1] The defendant's attorney made clear this message was coming from the defendant. The potential witness's attorney did not reveal anything about the potential witness's cooperation or lack thereof. The next day, April 27, 2018, the potential witness's attorney received a letter faxed from the defendant's mother's fax number signed by the defendant and addressed to the potential witness and the potential witness's attorney in which he made threats to the potential witness, whom the defendant referred to as "coldly cooperating" with the government. On April 30, 2018, a New York Supreme Court Judge issued a temporary order of protection against the defendant at the request of the potential witness.

In May 2018, the defendant reproduced to third parties at least three copies of the wiretap interception produced by the government in discovery in this case. This was in violation of a protective order issued by the Court. The interceptions were provided to third parties for the apparent reason to harm individuals who did not share the defendant's political views.

On June 6, 2018, the Court revoked the defendant's bail, and he has been detained since that time. See ECF Dkt. No. 132. The Court also ordered the defendant to undergo a psychological evaluation. See id. After the defendant was deemed capable of understanding the proceedings and standing trial, see ECF Dkt. No. 165, the defendant entered a plea pursuant to a plea agreement with the government, see ECF Dkt. No 174. On March 18, 2019, the defendant pleaded guilty to Count One of the indictment, charging wire fraud, in violation of 18 U.S.C. § 1343, and to Count Nine, charging extortionate collection of credit conspiracy, in violation of Title 18, United States Code, Section 894(a). The plea colloquy was held before the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, who recommended that the Court accept the defendant's plea. See ECF Dkt. No. 183, at 30:21-23.

---

[1] As set forth in the government's initial detention memorandum, the defendant is well known for his scorched earth litigation tactics. See, e.g., id. at 12-14.

On July 31, 2019, the U.S. Probation Office ("Probation") issued the Presentence Investigation Report ("PSR"). On August 7, 2019, the defendant filed various objections to the PSR. On August 9, 2019, Probation issued a PSR Addendum adopting several changes requested by the defendant but rejecting his requested Guidelines offense level modifications.

III.  Guidelines Calculation

   A.  Applicable Law

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still required to consider Guidelines ranges in determining sentences, but also may tailor the sentence in light of other statutory concerns. See 543 U.S. 220 (2005); see also 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

   B.  The Application of the Guidelines

The plea agreement included a stipulated Guidelines estimate by the government and the defendant. See Plea Agreement at 3-4. Probation's Guidelines calculation in the PSR differs from the plea agreement in two respects.

First, with respect to Count One, the plea agreement includes a 14-level enhancement for loss exceeding $550,000. The PSR calculates an intended loss of $516,353.24, based on updated loss figures provided for each victim, as reflected in the table above. The government respectfully submits that the $516,353.24 figure is appropriate and be adopted, thus resulting in a 12-level offense level enhancement.

7

Second, for Count Nine, Extortionate Collection of Credit Conspiracy, the PSR recommends the inclusion of a two-level enhancement for the offense involving the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10). The government submits this enhancement for two reasons. First, the extortion conspiracy is calculated under Chapter 2E2 of the Guidelines and the cross-references for offense level adjustments do not include the 2B1 fraud/monetary loss calculations. Second, the extortion offense here was not sophisticated. Instead, it was one done with violence and force where a weapon and threats were used by the defendant and his co-conspirators to obtain the money they wanted from Co-Conspirator #1. See U.S.S.G. § 2B1.1, App. N. 9 ("'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense").

The government submits that the correct Guidelines calculation is thus:

<u>Count One: Wire Fraud Conspiracy</u>

| | |
|---|---:|
| Base Offense Level (§§ 2B1.1(a)(1), 2X1.1(a)) | 7 |
| Plus: Loss Amount (§ 2B1.1(b)(1)(H)) | +12 |
| Plus: Sophisticated Means (§ 2B1.1(b)(10)) | +2 |
| Plus: Abuse of Trust (§ 3B1.3) | +2[2] |
| Count One Total: | 23 |

<u>Count Nine: Extortionate Collection of Credit Conspiracy</u>

| | |
|---|---:|
| Base Offense Level (§ 2E2.1(a)) | 20 |
| Plus: Use of a Dangerous Weapon (§ 2E2.1(a)) | +4 |
| Count Nine Total: | 24 |

| Multiple Counts Analysis (§ 3D1.4): | <u>Level</u> | <u>Units</u> |
|---|---:|---:|
| Wire Fraud Conspiracy | 23 | 1 |
| Extortion Conspiracy | 24 | 1 |
| Total Increase in Offense Level: | | +2 |

---

[2] In the defendant's objections to the PSR, he argues that the § 3B1.3 Abuse of Trust enhancement is not appropriate and was not agreed to in the plea agreement. See Def. PSR Objections at 2. This adjustment was part of the plea agreement and stipulated to by the defendant. The reference to "Abuse of Trust" in paragraph 43 of the PSR appears to be inadvertent and is unrelated to the Guidelines calculation, which is set forth in paragraphs 48 to 63.

Offense Level Calculation

| | |
|---|---:|
| Highest Offense Level (§ 3D1.4) | 24 |
| Increase in Offense Level (§ 3D1.4) | +2 |
| Obstruction of Justice (§ 3C1.1) | +2 |

**Total Offense Level** **28**

The PSR sets forth accurately the basis for each of the applicable offense level calculations and adjustments. See PSR ¶¶ 48-69.

The defendant should receive a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), and the government hereby moves for an additional one-level reduction for early acceptance under § 3E1.1(b). This results in a Final Offense Level of 25. The defendant is in Criminal History Category I. The advisory Guidelines range is thus 57 to 71 months' imprisonment.

      C.      The Defendant's Factual Objections to the PSR

The defendant lodged a number of factual objections to the PSR that have no bearing on the Guidelines calculation but, instead, appear intended to portray the defendant as a minimal or peripheral participant in the two conspiracies. The government's response to each objection is as follows:

- Pages 5-6; Paragraph 11-12—The defendant objects to the fact he told Co-Conspirator #1 that Padula had family members connected to organized crime, and that these connections could be useful during the scrap metal fraud. At a Fatico hearing the government would prove that this was true. Indeed, the defendant provided details about the individuals in Padula's family. The defendant does not object to the characterization of Beck's role or the defendant's belief about his organized crime connections. See PSR ¶ 37. The defendant thus does not dispute that potential connections to organized crime were part of the fraudulent scheme. This objection should be rejected.

- Page 6; Paragraph 13—The defendant objects to the statement that Omni and Commercial, the companies he registered, were fraudulent. The statement in the PSR refers to the activities indisputably carried out by the companies—to defraud purchasers of scrap metal. To the extent this is a technical objection, the government notes that the names chosen for the companies were meant to mirror *actual* scrap and recycling companies and give customers a misimpression about whom they were dealing with. From the outset, it was clearly contemplated that Commercial and Omni would be used to perpetrate a fraud. This objection should be rejected.

- Page 6; Paragraph 14—The defendant objects to the description of the Commercial Metal fraudulent scheme where deposits would be taken from a customer and then no material provided. This objection contravenes the fundamental premise of the fraud

9

and the established record as to what transpired with Kanamax. Specifically, Kanamax wired $31,500 to the defendant's attorney IOLA escrow account. PSR ¶ 15. After Kanamax's money was deposited into the defendant's account, the conspirators withdrew it and made no deliveries to Kanamax; in effect, they stole $31,500. PSR ¶¶ 15-16. Kanamax then threatened criminal charges. PSR ¶ 17. To the extent the defendant disagrees that he was a participant in this scheme, he should not receive any acceptance of responsibility credit.

- Page 7, Paragraphs 21-25—The defendant objects to the characterization of R.D.'s role in the scheme; including his referral of R.D. to be the President of Omni. This information is based on witness statements, including information from R.D., who will be present at the sentencing to make a victim-impact statement. There is no dispute that R.D. was a client of the defendant's, was the President of Omni, and was listed as the signatory on the accounts used in the fraud. This objection, which is flatly contrary to the record, should be rejected.

- Page 9; Paragraph 35—The defendant objects to the characterization that the defendant never provided Co-Conspirator #1 with billing records and an accounting of fees. This is apparently because the records were seized by the government. The defendant fails to explain how having a photocopy of billing records proves that they were provided to the defendant's client. This objection should be rejected.

- Page 10; Paragraph 36—The defendant objects that he did not direct Padula to visit Co-Conspirator #1 to collect a debt, and that Padula never gave the defendant money from Co-Conspirator #1. This is contrary to the record and the fundamental premise of the extortionate scheme to which the defendant pleaded guilty. Padula and Beck were collecting a debt owed to the defendant and, apparently, bought by Padula from the defendant. The debt was based on an outstanding legal bill from the defendant. The defendant, in one way or another, was paid or supposed to be paid for that bill. This objection should be rejected.

- Page 10; Paragraph 37—The defendant objects that he never directed Co-Conspirator #1 to pay money to Padula and Beck for the "sit-down" with Chinese mafia members. The government's evidence is based on witness information. The witness provided details and indicated that Co-Conspirator #1 paid money for this supposed event having occurred. This objection should be rejected.

- Page 10; Paragraph 38—The defendant objects to the characterization that he was "well aware" that Padula and Beck intended to kidnap Co-Conspirator #1. The defendant's objection is technical in nature—he is only objecting to being "aware" of a kidnapping occurring, and he concedes he knew they would be extorting Co-Conspirator #1 inside the defendant's law office. The defendant lured Co-Conspirator #1 to that office under false pretenses of having him sign paperwork. The defendant, of course, knew that no such paperwork would be signed because he had no intention of meeting Co-Conspirator #1

at the Law Firm. Simply because the defendant apparently failed to recognize the unremarkable legal principle that luring a person to a private room and then holding them at gunpoint constitutes both kidnapping and extortion does not change the underlying facts or render the PSR inaccurate. This objection should be rejected.

- Page 11; Paragraph 42—The defendant objects to the statement that he recruited the Client, R.D., to the scheme and that he opened fraudulent bank accounts in R.D.'s name. As noted above, the defendant promised R.D. additional legal services for participating in the fraudulent scheme. The defendant made referrals to the banks where R.D. opened the accounts but did not physically travel to open the accounts with R.D. This objection, subject to the previous correction, should be rejected.

- Pages 11-12; Paragraph 43—The defendant objects to the Abuse of Trust reference in this paragraph. As detailed above, this appears to have been inadvertent in the PSR and was not actually included in the Guidelines calculation for Count Nine. This objection should be sustained as it relates to the language in Paragraph 43.

- Page 13; Paragraph 57—The defendant objects to the Sophisticated Means enhancement being included in Count Nine's calculation. As detailed above, the government agrees and this objection should be sustained.

- Page 14; Paragraph 69—This objection, concerning the final offense level calculation, is tied to the prior objection and should be sustained.

- Pages 15-16; Paragraph 75—The defendant objects to the description of the pending Richmond County charges against him. The defendant's factual objection about the status of the case appears correct and should be sustained.

- Page 16; Paragraph 77—The defendant objects to the eyewitness description of his conduct during a driving under the influence offense. The information contained in the PSR appears accurate, and the objection should be rejected.

IV.    Argument

The government respectfully requests that the Court impose a sentence within the advisory Guidelines range of imprisonment of 67-71 months because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A sentence within the advisory Guidelines will also further the aims of specific and general deterrence. See id. §§ 3553(a)(2)(B), (a)(2)(C).

Financial crimes and violent crimes like the one the defendant pleaded guilty to are serious and warrant significant punishment. See 18 U.S.C. § 3553(a)(1). The defendant believed this his co-conspirators were dangerous men and he knew that there was a serious risk

11

of violence when he lured his client to the defendant's office to be extorted. The defendant's history and characteristics also weigh in favor of a Guidelines sentence. Id. The defendant not only considered himself above the law, his legal practice was integral to the fraud. The defendant filed incorporation papers with New York State for fraudulent companies that he and his co-conspirators used to facilitate the fraud, and he used his law office as the address for the fraudulent companies. Moreover, the defendant recruited a blind man, who was on public assistance, to be the nominal president of one of the fraudulent companies by promising to perform legal work for him—work the defendant never meaningfully performed and stopped as soon as the money from the fraud stopped flowing. The defendant also helped set up bank accounts to receive victims' money and used his IOLA account and his firm credit card account to launder money. Beyond the crimes of conviction, the defendant has terrorized his adversaries and those close to him, attempted to obstruct justice and violated a serious court order issued to protect the safety of others. The defendant is also notorious for cyberbullying and is currently under indictment for crimes related to his creation of false Facebook pages to harass perceived enemies and political opponents. There is also ample evidence that he has used lawsuits to further his personal vendettas against his perceived enemies.

    A Guidelines sentence will also further the aims of general and specific deterrence. See 18 U.S.S.G. § 3553(a)(2)(B), (C). Here, both are at issue. The defendant has committed crimes over the course of many years. In light of the temptation to commit fraud again, especially given that he is likely to lose his law license, the Court's sentence should be substantial so as to provide specific deterrence for the defendant.

    Additionally, the need for general deterrence in this case is high. As financial crimes are difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

V.	Conclusion

For the foregoing reasons, the government respectfully submits that a sentence within the advisory Guidelines range of 67-71 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:	/s/
James P. McDonald
Assistant U.S. Attorney
(718) 254-6376

cc:	Counsel of Record (by Email)