UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>– against –<br><br>RICHARD LUTHMANN,<br>Defendant. | **Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2)**<br><br>17-CR-664 |

**Parties:**

For United States

For Defendant

**Appearances:**

James P. McDonald
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
718-254-6376

Arthur L. Aidala
Law Offices of Aidala & Bertuna, P.C.
8118 13th Avenue
Brooklyn, NY 11228
718-238-9898

Mario D. Romano
8212 Third Avenue
Brooklyn, NY 11209
718-238-1144

JACK B. WEINSTEIN, Senior United States District Judge:

**Table of Contents**

I. Introduction..................................................................................................................1

II. Offense......................................................................................................................2

III. Guilty Plea...............................................................................................................4

IV. Sentencing Hearing.................................................................................................4

V. Offense Level, Criminal History Category, and Sentencing Guidelines Range.........6

VI. Law...........................................................................................................................6

VII. 18 U.S.C. § 3553(a) Considerations......................................................................7

   A. Characteristics of Defendant...............................................................................7

   B. Well-Being of Lawyers........................................................................................9

VIII. Sentence................................................................................................................11

IX. Conclusion..............................................................................................................12

### I. Introduction

Defendant Richard Luthmann ("Luthmann" or "Defendant") abused his status as a lawyer and conspired to commit fraud and extortion. He, together with others, devised a scheme to defraud export companies purchasing scrap metal for shipment to foreign customers, and then organized a scheme to extort a coconspirator. While on pretrial release following his arrest, Luthmann engaged in witness tampering and provided evidence to third parties in violation of a court order.

Following a forensic mental health evaluation, Defendant pled guilty to wire fraud conspiracy, under 18 U.S.C. §§ 1348, 1349, and extortionate collection of credit conspiracy, under 18 U.S.C. § 894(a). Although he is remorseful for his conduct and in alcohol and drug abuse recovery, his crimes were absurd, bizarre, and ruthless. The case illustrates the danger in ignoring mental health problems of practicing lawyers.

Defendant is sentenced to 48 months' incarceration, to be followed by three years' supervised release.

## II. Offense

Luthmann began operating his own law firm in 2010. Presentence Investigation Report ("PSR") ¶ 109. Through his law practice, Defendant met the clients who became his coconspirators and codefendants. For several years, Luthmann represented an individual in litigation relating to the scrap metal business ("Coconspirator 1"). PSR ¶ 10.

Scrap metal from the United States is sent abroad in large shipping containers. *Id.* Foreign customers pay a price per unit of weight for scrap metal, separated and charged for by value. *Id.*

In 2015, following Defendant's introduction of Coconspirator 1 to another client ("Coconspirator 2"), the three individuals devised a scheme to defraud companies seeking to buy scrap metal. PSR ¶ 12. Coconspirator 1 identified potential victims; Luthmann registered two companies to operate the fraud, facilitated the opening of bank accounts for the fraud, and corresponded with "customers"; Luthmann brought Coconspirator 2 into the scheme because Luthmann believed he had organized crime connections and could help settle disputes. PSR ¶¶ 12–13.

Using the companies Defendant created, which were named to closely match legitimate scrap and recycling businesses, the conspirators defrauded eight companies. PSR ¶ 34; Gov't Sent. Mem. 2, ECF No. 207. In early October 2015, one of the fraudulent companies contracted to sell $31,500 worth of scrap metal. PSR ¶ 15. The purchaser wired the funds to an Interest on Lawyer Account ("IOLA") belonging to Luthmann. *Id.* Those funds were then wired to an account controlled by Coconspirator 1. PSR ¶ 16. When no scrap metal delivery was made to the purchaser, it threatened criminal charges. PSR ¶¶ 15–17. The conspirators returned the

money to the purchaser, but used the lessons of this failure to develop a more sophisticated fraud. PSR ¶¶ 17–18.

For each subsequent purchaser, the second fraudulent company arranged to sell and ship a container of scrap metal that had been diluted with cheaper metal. PSR ¶ 18. The valuable scrap metal was placed on top of the cheaper filler metal, and in close proximity to holes predrilled in the container to make it appear that the entire container was filled with the valuable metal. *Id.*

The conspirators also began using aliases when interacting with customers, recruited a blind person under the care of a guardian ad litem to be the nominal president of the company, and laundered the proceeds of the transactions through various banks. PSR ¶¶ 18–23. Luthmann suggested using the blind person as a nominal president because his mental disability precluded his being sued. *See* Gov't Sent. Mem. 3. The conspirators operated quickly to make as many "sales" as possible before word got out that they were shipping overvalued material. *Id.* In just a few weeks, they made over $484,000 in fraudulent sales. PSR ¶ 34. Approximately $190,000 of this money was transferred to Defendant, and he charged $15,000 to a debit card associated with the fraudulent company's bank account. PSR ¶ 32; Gov't Sent. Mem. 4. He was actively involved in monitoring payments and responding to bank inquiries about transfers. *Id.*

While the scrap metal scheme was ongoing, Luthmann demanded legal fees and other money from Coconspirator 1, including money to pay an enforcer to sit down with members of a Chinese organized crime enterprise hired by disgruntled customers. PSR ¶¶ 35–35. The story about the Chinese organized crime enterprise had no basis. Gov't Sent. Mem. 4–5. In December 2016, Defendant arranged for Coconspirator 2 and the enforcer, who had purportedly dealt with the Chinese organized crime enterprise, to hold Coconspirator 1 in a room at Defendant's law

3

office and extort him. PSR ¶ 38. A loaded gun was pointed toward Coconspirator 1; he was directed not to call the police. *Id.*

Defendant was ultimately indicted on 11 felony counts. *See* Indictment, ECF No. 1, Nov. 30, 2017 (filed under seal). He was arrested in December 2017 and detained until March 2018, when he was released on a $1.5 million collateral bond. PSR at 1. While released, he sent his wife a threatening letter because he believed that she was cooperating with the government. PSR ¶ 5. She was granted an order of protection against Defendant. *Id.* Luthmann also provided to a friend three copies of wiretap interceptions so that the friend could distribute the materials to others as directed by Defendant. PSR ¶ 7. A protective order had prohibited such a distribution. PSR ¶ 6.

Defendant's bail was revoked in June 2018. PSR ¶ 8. He has been incarcerated since then. *Id.*

### III. Guilty Plea

On March 18, 2019, following a forensic mental health evaluation of Defendant's competency to stand trial, he pled guilty to wire fraud conspiracy, in violation of 18 U.S.C. §§ 1348, 1349, and extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a). *See* Tr., ECF No. 183. Defendant's guilty plea was accepted by the magistrate judge and again by this court.

### IV. Sentencing Hearing

The sentencing hearing was conducted on September 5, 2019 and September 9, 2019. *See* Tr., Sept. 5, 2019; Tr., Sept. 9, 2019. The proceedings were videotaped to develop a record of courtroom atmosphere. *See In re Sentencing*, 219 F.R.D. 262, 264–65 (E.D.N.Y. 2004) ("The sentencing hearing normally requires that the defendant be observed for credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers of incarceration,

and a myriad other relevant factors. In many instances, it is necessary to observe the employer's and familial ties to the defendant. A judge applies mental impressions of many tangible and intangible factors when imposing a sentence.").

An investigator from the Department of Commerce spoke briefly during the hearing. He testified about how the investigation of the scrap metal scheme began and how such schemes can negatively affect international business relations and the reputation of the United States. *See* Tr. 29:1–20, Sept. 5, 2019.

Also testifying were two victims of the scrap metal scheme. Adam Trusz, Procurement and Operations Manager of GDB International, described the company's interactions with the conspirators, including the problems his company had when a shipping container purportedly filled with copper wire was shipped to China and held at customs because it had actually been filled with concrete. *See id.* 31:9–37:13.

The blind individual whom the conspirators used as nominal president of one of the fraudulent companies also testified, recounting how he met Defendant and the other conspirators and how he became involved by them:

> Q Sir, . . . could you describe how you met Richard Luthmann?
>
> A Yes. I was walking up and down Victory Boulevard to Manor back and forth. . . . I was almost in front of the old health food store there and I ran into a gentleman named Arthur. He . . . gave me $3 and about three cigarettes. . . . So I explained to Arthur about the potential case I had. So he said, I know an attorney. Would you like to talk to him? I said, Sure. He brings me upstairs to 1811 Victory Boulevard and introduced me to Mr. Luthmann. So we were talking, . . . and he comes up with a proposition, Do you want to be President of Omni Metal Corp.? So I had no money, I had no income, Sure. But I told him, I'm on Social Security. And he said, Do not worry about it.

*Id.* 49:8–50:8.

5

Defendant spoke on his own behalf, as did his mother. Both testified that Luthmann's mental health has improved substantially since his incarceration. *See id.* 75:16–76:14, 80:2–13.

### V. Offense Level, Criminal History Category, and Sentencing Guidelines Range

The base offense level for conspiracy to commit wire fraud is seven. U.S.S.G. § 2B1.1(a)(1). Twelve points are added because the loss was greater than $250,000 but less than $550,000. *Id.* § 2B1.1(b)(1)(G). Two points are added because Luthmann used sophisticated means to conduct the offense. *Id.* § 2B1.1(b)(1). And two more points are added because he abused his position as a lawyer to commit the offense. *Id.* § 3B1.3. The total offense level for the offense is 23.

The base level offense for extortionate collection of credit conspiracy is 20. *Id.* § 2E2.1(a). Four points are added because a firearm was used in the commission of the crime. *Id.* § 2E2.1(b)(1)B). The total offense level for this offense is 24.

Adjusting for the multiple counts, two points are added to the highest offense level. *Id.* § 3D1.4. Two additional points are added for obstruction of justice. *Id.* § 3C1.1. Three points are then deducted for acceptance of responsibility and timely notification of intent to enter a plea. *Id.* §§ 3E1.1(a), (b). The total adjusted offense level is 25.

Luthmann's criminal history category is I. PSR ¶ 73. The advisory range under the Sentencing Guidelines is 57 to 71 months' imprisonment.

### VI. Law

The Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 246 (2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552

U.S. 38, 49 (2007). The Guidelines serve as a lodestar for determining the sentence from which a district court may depart when it "consider[s] all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49–50. The court "shall state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c).

## VII. 18 U.S.C. § 3553(a) Considerations

### A. Characteristics of Defendant

Luthmann was born in Staten Island in 1978. PSR ¶ 80. He is one of three children of his parents, who separated when Defendant was 13 years old. PSR ¶¶ 80–81. Luthmann's mother is a real estate broker and has an "excellent" relationship with Defendant. *Id.* His father is a pharmaceutical consultant and lives in Florida. PSR ¶ 80. Although the father was infrequently present when Luthmann was a child because of drug and alcohol abuse, they have since reconciled and have an "okay" relationship. PSR ¶ 81. Luthmann's parents, stepfather, and sister are aware of the present offenses and are supportive. PSR ¶¶ 81–83. Defendant's marriage ended following his arrest and his letter accusing his now ex-wife of cooperating with the government. PSR ¶ 85. They no longer have any relationship. *Id.*

Defendant excelled academically. He graduated from Columbia University in 2001. PSR ¶ 104. He received a Juris Doctor degree from New York Law School in 2004 and a Master of Laws in estate planning from the University of Miami in 2005. PSR ¶¶ 102–04. Following graduation, Luthmann worked in Florida with banks and insurance companies on asset structuring. PSR ¶¶ 111–12; Def. Sent. Mem. 2, ECF No. 200. In 2010, Defendant returned to New York, and was employed as an associate at a trusts and estates law firm before starting his own firm. PSR ¶¶ 109–10. He gained notoriety as a lawyer for, among other things, his request for trial by combat to resolve a civil suit brought against him for allegedly assisting a client to fraudulently transfer assets. *See* Frank Donnelly, *Real-life Game of Thrones: Lawyer seeks trial*

7

*by combat to resolve lawsuit*, Staten Island Advance (Aug. 4, 2015), https://www.silive.com/northshore/2015/08/real-life_game_of_thrones_layw.html; Reply Aff. Richard A. Luthmann, Esq., *Foley, et al. v. Luthmann et al.*, No. 150175/2014 (N.Y. Sup. Ct. July 24, 2015).

Luthmann also became involved in politics after his return to New York. *See* Def. Sent. Mem. 3–4. He is facing state law criminal charges relating to this involvement, including for allegedly trying to pay an exotic dancer to falsely report a sexual assault by the Staten Island District Attorney in an effort to disparage him and sway an election. PSR ¶ 75. Defendant's New Jersey law license has been suspended due to unethical conduct or failure to comply with rules governing attorneys. PSR ¶ 106.

Defendant has been an abuser of alcohol and cocaine. PSR ¶ 99; Def. Sent. Mem. 4–5. He reports drinking 1.75 liters of scotch each day throughout 2017 and spending "a couple of hundred [dollars]" on cocaine each week. PSR ¶ 99. The drug and alcohol use appears to have compounded Luthmann's existing mental health issues. He was diagnosed with anxiety and depression in 2012, and prescribed drugs which interact poorly with alcohol and drugs. PSR ¶ 96; Def. Sent. Mem. 4.

His mental health problems persisted after his arrest for the instant offenses. While released on bail in April 2018, Defendant admitted himself to a hospital because he believed he has having a nervous breakdown resulting from his marital problems. PSR ¶ 97. He was diagnosed with Bipolar I Disorder and hospitalized for 11 days. *Id.* Following his return to detention, this court ordered Luthmann to undergo a forensic mental health evaluation for a determination of his competency to stand trial. PSR ¶ 98. The evaluator concluded that a more appropriate diagnosis for Defendant is Bipolar II Disorder. *Id.* He spent several months at a

mental health treatment facility for purposes of this evaluation; Luthmann testified that he is thankful for the experience:

> Your Honor, I first want to thank you [for] sending me to Devens. Most people won't thank the Court for incarceration but actually sending me to Devens was a real turning point because I actually was diagnosed and I received the help that I needed with respect to bipolar disorder. I was seeking mental health for many years and nobody had ever diagnosed bipolar disorder. It was always other things. And finally, when I was treated there and treated with medications and treated for bipolar disorder, it unlocked a door for me and allowed me to get a handle on my mental health.

Tr. 80:2–12, Sept. 5, 2019. Luthmann's mother also reports seeing a positive change in his mental health. *See id.* 77:20–78:14.

### B. Well-Being of Lawyers

An important consideration in determining the appropriate sentence is Luthmann's mental and physical well-being. He has long suffered with mental health issues and abuse of drugs and alcohol.

These are not uncommon problems for lawyers. To review the literature over the last half-century is to conclude that many lawyers are not well psychologically. *See, e.g., Lawyer Distress: Alcohol–Related Problems and Other Psychological Concerns Among A Sample of Practicing Lawyers*, 10 J.L. & Health 1, 1–60 (1995–96) (estimating that nearly 70% of lawyers are likely to have an alcohol problem at some time during their career and finding that while 9% of U.S. adults meet the criteria for alcohol abuse or dependency, 15–18% of lawyers were problem drinkers); Patrick R. Krill et al., *The Prevalence of Substance Use and Other Mental Health Concerns Among American Attorneys*, 10 J. Addiction Med. 46 (2016) (concluding that 21% of licensed, employed attorneys qualify as problem drinkers, 28% struggle with some level of depression, 19% demonstrate symptoms of anxiety, and 11.5% have suicidal thoughts at some time during their career).

Young attorneys in particular—those within the first ten years of practice—exhibit the highest propensity for substance abuse and mental health problems. Krill, et al., *supra*, at 46–52. This is contrary to previous research, which suggested those levels increased with longevity in the profession and age. *Id.* Particular attention should be paid to the problems of younger attorneys.

In August 2017, the American Bar Association (the "ABA") announced a "crossroads" in the legal community: "Sadly, our profession is falling short when it comes to well-being." Bree Buchanan & James C. Coyle, *The Path to Lawyer Well-Being: Practical Recommendations for Positive Change*, ABA (August 14, 2017), https://www.americanbar.org/content/dam/aba/images/abanews/ThePathToLawyerWellBeingReportFINAL. The struggle of practicing lawyers currently serving clients, in a profession that depends on the public's trust, must concern the entire legal profession.

According to the ABA, the two most common barriers preventing lawyers from seeking help are (1) not wanting others to find out they needed help, and (2) concerns regarding privacy. *Id.* at 13. The legal profession can work toward ameliorating these concerns, but courts have a particular role in doing so. As the ABA noted, judges can help foster an open dialogue within the profession about our collective problems:

> The stigma surrounding mental health and substance use disorders poses an obstacle to treatment. Judges are undisputed leaders in the legal profession. We recommend they work to reduce this stigma by creating opportunities for open dialogue. Simply talking about these issues helps combat the unease and discomfort that causes the issues to remain unresolved.

*Id.* at 23. Well-being struggles can be normalized through regular discussion of mental health issues. Mentorship of young attorneys seems an obvious way in which those in the legal profession, including judges, can help reduce stigma.

10

It is also important, says the ABA, that all in the profession are aware of lawyer assistance programs. *Id.* at 13. The New York State Bar Association has had, for many years, a Lawyer Assistance Program ("LAP") with the goal of "assist[ing] in the prevention, early identification and intervention of problems that can affect professional conduct and quality of life." New York State Bar Association, *Lawyer Assistance Program*, https://www.nysba.org/lap (last visited Oct. 15, 2019). The LAP provides both a confidential email system and a private phone number where lawyers can report concerns about colleagues or themselves. *Id.* The ABA stresses that there is still a greater need for general resources for programs like the LAP, as well as specific expansion of preventative and intervention programs. Buchanan & Coyle, *supra*, at 13.

A shift is needed in the legal profession's culture to ensure that lawyers, including those such as Defendant, are engaging in self-care when they practice law.

## VIII. Sentence

The court has considered, among the other factors under 18 U.S.C. § 3553, "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence." 18 U.S.C. §§ 3553(a)(1), (2). Defendant is sentenced to 48 months' incarceration, to be followed by three years' supervised release.

Luthmann's crimes were bizarre and ruthless. He used his status as a lawyer to give an air of legitimacy to a serious fraudulent scrap metal scheme. His law license was the recruitment tool that allowed him and his coconspirators to take advantage of a disabled individual to perpetrate the fraud. Unsatisfied by traditional methods of debt collection, he used threats of violence to collect a legal debt purportedly owed by a coconspirator. The sentence imposed will appropriately punish and deter Defendant from similar conduct.

11

Luthmann's crimes damaged American commerce. It is important that American scrap metal dealers are able to ship their product abroad without suspicion that they are committing fraud. Deterrence of others who might engage in similar conduct was considered by the court.

It is not lost on the court that Defendant suffers from substance abuse and mental health issues, and was under the extreme pressure that is common among lawyers. Stigma and underresourced programs no doubt contributed to his wariness of obtaining intensive necessary assistance dealing with these problems. These important concerns, however, do not warrant a sentence shorter than 48 months.

Orders of restitution and forfeiture have been entered separately. No fine is imposed because Luthmann lacks the assets to pay one. A $200 special assessment is imposed.

It is recommended that the Bureau of Prisons incarcerate him close to New York so that he may maintain his family ties.

### IX. Conclusion

The Guidelines have been considered and the sentence granted to ensure that it is "sufficient, but not greater than necessary" under 18 U.S.C. 3553(a).

SO ORDERED.

_____
Jack B. Weinstein
Senior United States District Judge

Date: October 15, 2019
Brooklyn, New York

12